IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PAUL EVAN SEELIG, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 1:16CV1166 |
| FRANK L. PERRY, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on Defendants Frank Perry, George Solomon, Paula Smith, Anita Wilson, Wanda Kendrick, Carolyn Adams, Lisa Barnard, Larry Callicut, and Chandra Ransom's (collectively, "Moving Defendants") Motion for Summary Judgment. (Docket Entry 98.)

### I. BACKGROUND

Plaintiff, a *pro se* litigant and former prisoner of the State of North Carolina, initiated this action on September 22, 2016 by filing a complaint against numerous defendants.[1]

---

[1] Moving Defendants constitute about half of the named defendants in this action. (*See* Complaint ¶¶ 4-25, Docket Entry 2.) The complaint alleges that Moving Defendants held a variety of positions at relevant times. Defendant Perry was the Secretary of the North Carolina Department of Public Safety ("NCDPS"). (*Id.* ¶ 4, Docket Entry 2.) Defendant Solomon was the Director of NCDPS. (*Id.* ¶ 5.) Defendant Smith was the chief medical director of NCDPS. (*Id.* ¶ 6.) Defendant Wilson was a physician at Central Prisoner Regional Medical Center. (*Id.* ¶ 9.) Defendant Kendrick was a nursing supervisor at Randolph Correctional Center. (*Id.* ¶ 16; Answer of Adams, Bernard, Kendrick, and Ransome ¶ 16, Docket Entry 42.) Defendant Adams was a nurse at Randolph Correctional Center. (Compl. ¶ 17.) Defendant Barnard is also a nurse at Randolph Correctional Center. (*Id.* ¶ 18.) Defendant Callicut was an Assistant Superintendent at Randolph Correctional Center. (*Id.* ¶ 21.) Defendant Ransom was the Superintendent at Randolph Correctional Center. (*Id.* ¶ 22.)

(Docket Entry 2.) Plaintiff alleges[2] that he was diagnosed with "cardiac heart disease" in 2013. (*See id.* 26.) He further alleges that he experienced pain in his chest, left arm, and shoulder blade on March 30, 2015 while incarcerated at Alexander Correctional Institution. (*Id.* ¶ 26.) He was evaluated by a physician's assistant the next day but was not evaluated again by medical staff for over two weeks. (*Id.* ¶ 34, 36.)

Plaintiff transferred to Randolph Correctional Center on April 17, 2015. (*Id.* ¶ 37.) Upon medical intake, one Nurse Powell informed Plaintiff that he did not need his heart medication and "took them away from" him. (*Id.* ¶ 38.) On April 22, 2015, Plaintiff began to experience nausea and pain in his chest and both arms and shoulder blades. (*Id.* ¶¶ 39-40.) He was seen by various medical staff which did not include any of the Moving Defendants. (*Id.* ¶¶ 39-56.) At some point, a member of this staff made the decision to send Plaintiff to a hospital for testing. (*Id.* ¶ 57.) After Randolph County EMS arrived, Plaintiff went into cardiac arrest and was taken to the hospital. (*Id.* ¶¶ 59-63.) A non-party correctional officer then administered CPR while Defendant Callicut was present. (*Id.* ¶ 63.) Plaintiff was released from the hospital and returned to Randolph Correctional Center on April 24, 2015. (*Id.* ¶ 67.) At the time, Plaintiff was still experiencing chest pain, which he attributed to the CPR and shocks from an external defibrillator. (*Id.* ¶ 63.)

Plaintiff reported additional pain in his chest and left arm on April 26, 2015. (*Id.* ¶¶ 69, 72.) Early the next morning, Plaintiff felt "extremely sick" and informed a correctional officer that he was feeling pain in his chest, left arm, and shoulder blade. (*Id.* ¶ 78.) Plaintiff was

---

[2] Plaintiff's Complaint is lengthy. (*See* Compl.) For the sake of brevity, the Court's summary of his allegations primarily relates to the allegations against Moving Defendants.

moved to the medical clinic, but Nurse Powell accused him of "faking it" and told him that he was just hungry and needed to eat. (*Id.* ¶¶ 80-81.) About an hour-and-a-half later, another nurse called Randolph County EMS. (*Id.* ¶ 83.) When EMS arrived, Plaintiff informed them that the nurses at the clinic thought he was "faking it" and a member of the EMS team told medical clinic staff that Plaintiff needed to immediately go to the hospital as his heart was in distress. (*Id.*) Defendant Callicut was present in the medical clinic during this conversation. (*Id.*)

Plaintiff was hospitalized for several days. (*See id.* ¶¶ 84-85.) On April 30, 2015, he was discharged and taken to Central Prison Regional Medical Center. (*Id.* ¶ 85.) Defendant Wilson served as his doctor there. (*Id.*) Defendant Wilson spoke with a previous doctor who treated Plaintiff and scheduled a follow-up appointment with one Doctor Cheek at High Point Regional Hospital. (*Id.* ¶¶ 84, 87.) Plaintiff was not discharged from Central Prison Regional Medical Center until September 4, 2015. (*Id.* ¶ 86.)

Upon Plaintiff's return to Randolph Correctional Center, two nurses, Coats and Frike, ordered the cessation of Plaintiff's chronic medications and cancelled his follow-up appointment with Dr. Cheek and another exam. (*Id.* ¶¶ 89, 95.) Due to this, Plaintiff experienced a gastrointestinal bleed on December 8, 2015. (*Id.* ¶ 96.) When Plaintiff first informed medical staff of blood in his stool at approximately 7:00 a.m., they told him "not to worry about it." (*Id.*) When he informed one Nurse Frike at 11:00 a.m. that the bleeding had intensified, she inspected the bathroom and saw the blood. (*Id.*) Plaintiff went to the medical clinic at around 3:00 p.m. to retrieve prescription Warfarin. (*Id.* ¶ 97.) The dispensing nurse noticed that Plaintiff's lips were blue and he informed her of the gastrointestinal bleed. (*Id.*)

3

When the nurse called Nurse Frike to speak with her about the bleed, Nurse Frike told her that it was safe for Plaintiff to take the Warfarin. (*Id.*) Around 10:00 p.m. that evening, Plaintiff experienced further bleeding and passed out. (*Id.* ¶ 98.) When he was found, he was taken to Randolph Hospital and received a blood transfusion. (*Id.* ¶ 99.) While at the hospital, Plaintiff was informed that he was terminally ill and needed a left ventricular assistance device and ultimately a heart transplant and surgery for his Chron's disease. (*Id.* ¶ 100.)

Plaintiff was discharged on December 16, 2015. (*Id.* ¶ 101.) Though he was instructed to follow up with the heart failure and gastrointestinal clinics at UNC Chapel Hill, two nurses at Randolph Correctional Center, Nurse Frike and Nurse Coats, ignored these instructions. (*Id.* ¶¶ 101, 102.) On December 21, 2015, Plaintiff was found unresponsive in his bunk and taken back to Randolph Hospital. (*Id.* ¶ 105.) There was some concern that Plaintiff might die, so Defendant Callicutt called his family to come see him. (*Id.*) Plaintiff, however, survived and was discharged on December 28, 2015. (*Id.* ¶ 107.)

Upon his return to Randolph Correctional Center, Nurse Coats refused to provide Plaintiff his medication. (*Id.* ¶ 108.) Plaintiff was sent to Randolph Hospital on January 12, 2016 after he spit up blood, which he attributed to a nose bleed. (*Id.* ¶ 109.) The next day, while at Randolph Correctional Center, Plaintiff was told that he was to be admitted at UNC Hospital. (*Id.* ¶¶ 115-116.) However, when he arrived, he was told that he instead was there for a colonoscopy. (*Id.* ¶ 117.) Plaintiff refused the colonoscopy. (*See id.* ¶ 118.)

Plaintiff was again transferred to Central Prison Regional Medical Center on January 29, 2016. (*Id.* 137.) Upon arrival, a doctor accused him of "faking" his condition and said that he would be "locked up 24 hours a day" for asking for medical assistance (*Id.*) On January

4

30, 2016, Defendant Wilson spoke with Plaintiff and expressed surprise that he had not seen a cardiologist in November 2015. (*Id.* ¶ 138.) Plaintiff informed her that Defendant Barnard, with authorization from Defendant Kendrick and Nurse Coats, cancelled that appointment in an attempt to save money. (*Id.*)

Plaintiff further alleges that, between January 29, 2016 and February 25, 2016, he did not receive any medical treatment. (*Id.* ¶ 142.) He was then brought to an appointment with Dr. Cheek at High Point Regional Medical Center. (*Id.* ¶ 143.) Dr. Cheek spoke with Dr. Wilson about the possibility of Plaintiff's release from Central Prison Regional Medical Center. (*Id.*)

Plaintiff returned to Randolph Correctional Center on March 4, 2016. (*Id.* ¶ 144.) Plaintiff wrote Defendants Smith and Solomon, as well as one McLeod Duncan, about the delay in treatment. (*Id.* ¶ 146.) Plaintiff wrote two additional letters to the same recipients. (*Id.* ¶¶ 147-49.) Plaintiff never received a response. (*Id.* ¶ 149.) Plaintiff continued his unsuccessful attempts to be seen by the UNC Heart Failure Clinic. (*Id.* ¶¶ 150-55.) In one of these attempts, he spoke to Defendant Ransom, who told him she would "look into it." (*Id.* ¶ 153.)

Plaintiff was again hospitalized on July 30, 2016 at Randolph Community Hospital due to an unspecified condition. (*Id.* ¶ 156.) On August 3, 2016, a nurse completed a form for early medical release at the request of Defendant Ransom. (*Id.* ¶ 158.) Plaintiff spoke with Defendant Ransom the next day. (*Id.* ¶ 157.) Defendant Ransom informed Plaintiff that she had spoken with Defendant Smith about early release for Plaintiff and that she was trying to

5

send Plaintiff to Central Prison as she did not want him to die at Randolph Correctional Center. (*Id.*)

On August 5, 2016, Plaintiff was once again transferred to Central Prison Regional Medical Center. (*Id.* ¶ 160.) Plaintiff was told on August 9, 2016 by one Dr. Meteko that Plaintiff would by "locked-up 24 hours a day, 7 days a week" until his release because he was "costing Randolph Correctional Center to [sic] much money." (*Id.* ¶ 163.) Plaintiff alleges that Dr. Meteko received these instructions from Defendants Perry, Solomon, and Smith. (*Id.*)

Plaintiff raises a number of claims against all Moving Defendants, including Eighth Amendment violations and medical malpractice. (*Id.* ¶¶ 175-89.) He also seeks to impose supervisory liability on Defendants Perry, Solomon, Smith, Callicut, and Ransom for his constitutional claims. (*Id.* ¶ 185.) Moving Defendants filed the instant motion for summary judgment on February 28, 2020. (Docket Entry 98.) Though Plaintiff was sent a Roseboro letter (Docket Entry 101) and was granted an extension of time to respond (Text Order 3/27/2020), he has not filed a response.

## II. DISCUSSION

At the outset, the Court notes that, because Plaintiff has failed to file a timely response, Moving Defendants' motion for summary judgment could be granted as a matter of course pursuant to Local Rule 7.3(k). Where a party fails to file a timely response, the motion will be "considered and decided as an uncontested motion, and ordinarily will be granted without further notice." Local Rule 7.3(k); *see also Kinetic Concepts, Inc. v. ConvaTec Inc.*, No. 1:08CV918, 2010 WL 1667285, at *6-8 (M.D.N.C. Apr. 23, 2010) (Auld, M.J.) (analyzing this Court's Local Rules 7.3(f), 7.2(a), and 7.3(k) and discussing authority supporting proposition that failure to

6

respond to argument amounts to concession). Alternatively, the Court recommends that the motion for summary judgment be granted because there is no genuine dispute as to any material fact and Moving Defendants are entitled to judgment as a matter of law.

The Moving Defendants raise several arguments in favor of their motion: 1) Plaintiff failed to exhaust his administrative remedies prior to filing suit; 2) Plaintiff cannot produce evidence to establish his claims of deliberate indifference; 3) Plaintiff's claims of medical negligence fails as a matter of law; 4) Moving Defendants are entitled to sovereign immunity with regard to Plaintiff's claims against them in their official capacity; 5) Moving Defendants are entitled to qualified immunity with regard to Plaintiff's claims against them in their individual capacity. (Docket Entries 99 at 9, 10, 18, 19.) The Court recommends that the Moving Defendants' motion for summary judgment be granted.

### A. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Bynum v. Poole*, 1:15CV960, 2017 WL 3578698, at *1 (M.D.N.C. Aug. 17, 2017); *see also Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving

7

party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, dissenting). When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson*, 477 U.S. at 248–49.

### B. Exhaustion of Administrative Remedies

The vast majority of Plaintiff's claims against Moving Defendants fail because Plaintiff has not exhausted his administrative remedies. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires inmates to properly exhaust administrative remedies before filing civil actions challenging the conditions of their confinement. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It is well-settled that Section 1997e's exhaustion requirement is mandatory. *See Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also*

8

*Woodford*, 548 U.S. at 90–91 (stating that the PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules"); *Anderson v. XYZ Correctional Health Servs., Inc.*, 407 F.3d 674, 676–77 (4th Cir. 2005) (citing *Porter*, 534 U.S. at 524).

Further, the North Carolina Department of Corrections has a three-step Administrative Remedy Procedure ("ARP") which governs the filing of grievances in each of its correctional facilities.[3] *Murray*, 2013 WL 3326661, at *2; *see also e.g., Moore v. Bennette*, 517 F.3d 717, 721 (4th Cir. 2008). The ARP first encourages inmates to attempt informal communication with responsible officials at the facility where the problem arose. ARP § .0301(a). If informal resolution is unsuccessful, the ARP provides that "any aggrieved inmate may submit a written grievance . . . ." *Id.* § .0310(a)(1). Additionally, the grievance must "contain language sufficient to put defendants on notice" of the constitutional violation. *Hamilton v. Daniels*, 5:13–CT–3048–FL, 2013 WL 6795008, at *3 (E.D.N.C. Dec. 20, 2013) (finding that the plaintiff's grievance failed to put prison officials on notice because it lacked information pertaining to his need for a safety helmet, wheelchair, or assistance from an orderly); *see also Holley v. Shirley*, 1:11CV508 GBL/JFA, 2012 WL 9702529, at *2 (E.D. Va. Nov. 19, 2012), *aff'd*, 521 Fed. Appx. 176 (4th Cir. 2013). If the inmate is not satisfied with the decision reached at the above-described step one of the grievance process, he or she may request relief from the facility head. ARP § .0310(b)(1). If the inmate is not satisfied with the decision reached at the above-described step two of the grievance process, he or she may

---

[3] The Court takes judicial notice of this established procedure of the Department of Corrections as a matter of public record. Fed. R. Evid. 201(1).

9

Case 1:16-cv-01166-LCB-JLW   Document 103   Filed 08/10/20   Page 9 of 14

appeal to the secretary of correction through the inmate grievance examiner (IGE). *Id.* § .0310(c)(1). The decision by the IGE or a modification by the secretary of correction shall constitute the final step of the Administrative Remedy Procedure. *Id.* § .0310(c)(6).

The record indicates that between January 1, 2015, and September 2016, the Inmate Grievance Resolution Board received thirteen step three appeals from Plaintiff.[4] (Affidavit of Finesse G. Couch ¶ 4, Docket Entry 47.) Only one relates to this matter.[5] In a grievance, filed on January 17, 2016, Plaintiff notes many of the medical issues he mentions in his complaint. (Ex. H, Grievance No. 4445–2016–EDM–00005, Docket Entry 47-8.) He particularly discusses the incident on January 13, 2016, when he was told he was being admitted to UNC Hospital, but upon arrival was informed that he was only there for a colonoscopy. (*Id.* at 3.) In the portion of the form titled "What remedy would resolve your grievance?,"

---

[4] In his Complaint, Plaintiff contends that has "used the prisoner grievance procedure" and has "appealed the denial of the grievance" multiple times (Complaint ¶¶ 171-174) but it is not apparent that Plaintiff completed the three-step process for these documents or if they are different than the ones in the record (*see* Docket Entries 47-1–47-13).

[5] Specifically, four of the irrelevant other step three appeals concern incidents arising out of Alexander Correctional Institution regarding Plaintiff's complaints about unrelated issues, including not receiving prescribed medication for his Crohn's disease, lack of ability to practice Jewish religious traditions, and lack of accessibility for disabled inmates. (Ex. A, Grievance No. 4870–B–14–582, Docket Entry 47-1; Ex. B, Grievance No. 4870–B–15–023, Docket Entry 47-2; Ex. C, Grievance No. 4870–M–15–074, Docket Entry 47-3; Ex. D, Grievance No. 4870–H–15–114, Docket Entry 47-4.) Another two concern an unrelated appeal to a disciplinary appeals board (Ex. E, Grievance No. 3100–15–0730, Docket Entry 47-5) and the inability to practice Jewish religious traditions (Ex. F., Grievance No. 3100–15–0987) while housed at the Central Prison Regional Medical Center. Two of the other step three appeals involve matters at predominantly about the conduct of one Officer Moffitt, a non-party, at Randolph Correctional Center. (Ex. I, Grievance No. 4445–2016–CDM–01275, Docket Entry 47-9; Ex. J, Grievance No. 4445–2016–CDM–01282, Docket Entry 47-10.) Three others from Randolph Correctional Center involve unrelated disputes including the quantity of medication Plaintiff was allowed to receive, a change in Plaintiff's dietary plan, a prescription for a walker, and missing or confiscated personal items (Ex. G, Grievance No. 4445–2015–EDM–00130. Docket Entry 47-7; Ex. K, Grievance No. 4445–2016–CDM–01285, Docket Entry 47-11; Ex. L, Grievance No. 4445-2016-FDM-01309, Docket Entry 47-12; Ex. M, Grievance No. 4445–2016–FDM–001329, Docket Entry 47-13.)

Plaintiff writes "That I'm told what the treatment plan is going to be with my heart, and get me to UNC to see the cardiologist/heart failure clinic and the UNC G.I. surgeon for Chron's disease per the hospital recommendations. (To do nothing will only lead to death)." (*Id.* at 2.)

With regard to claims in which Plaintiff seeks to hold Moving Defendants directly liable, the filing and appeal of this grievance fails to constitute exhaustion of Plaintiff's administrative remedies. While the grievance briefly mentions Plaintiff's medical history, it only details conduct by prison personnel between November 2015 and January 16, 2016. (*Id.* at 3.) It fails to put prison administrators on notice of any problem that may have existed prior or after that time period. As such, of the claims against *any* Defendant in this action, only those that arise from this time period have been exhausted. Furthermore, Plaintiff does not mention Moving Defendants in this grievance (*id.* at 2-4) and, with two nonmaterial exceptions[6], his complaint does not name them during this time period as well.[7] (*See* Compl. ¶¶ 95-128.) Plaintiff thus has not exhausted any claims that seeks to hold Moving Defendants directly liable, and summary judgment should be granted in favor of Moving Defendants with regards to any such claim.

---

[6] Plaintiff makes a solitary reference to Defendant Callicutt calling Plaintiff's family when he was taken to the hospital on December 21, 2015. (Compl. ¶ 105.) He also alleges that a physician at UNC called Defendant Adams to inquire why Plaintiff was sent there; Defendant Adams said she did not know and tried to speak to Nurse Coats and Nurse Frike to find an answer. (*Id.* ¶ 121.) Otherwise, no other Moving Defendants are named in the relevant portion of the complaint. (*Id.* ¶ 95-128.)

[7] Of course, Plaintiff need not identify specific Defendants in his grievance. *See Moore v. Bennette*, 517 F.3d 717, 726 (4th Cir. 2008) (holding that the ARP does not require identification of specific individuals in a prisoner's grievance).

Regarding Plaintiff's claims that seek to impose supervisory liability on Defendants Perry, Solomon, Smith, Callicut, and Ransom (collectively "Supervisory Defendants") for events between November 2015 and January 16, 2016, Plaintiff likely has exhausted his administrative remedies. However, as detailed below, Supervisory Defendants are entitled to summary judgment on those claims as well.

### C. Supervisory Liability Claims

Supervisory Defendants may not be held liable based upon a theory of *respondeat superior*, because *respondeat superior* generally is inapplicable to § 1983 suits. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). However, a supervisor may be liable for the actions of a subordinate if:

> (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
> (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and
> (3) there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

As stated above, Plaintiff's only surviving claims are those that relate to his January 16, 2016 grievance. However, Defendants Perry, Solomon, Smith, and Ransom are not even mentioned in the complaint until events after January 16, 2016; no knowledge or conduct is attributed to them from before that date. (*See* Compl. ¶¶ 146, 148-49, 153, 157, 163.) Thus, Plaintiff fails to allege the knowledge, deliberate indifference, or causation elements necessary for a constitutional supervisory liability claim to survive. While evidence in the record

12

indicates that Defendant Callicutt had actual or constructive knowledge of Plaintiff's plight,[8] Plaintiff does not allege that Defendant Callicut was the supervisor of any of the individuals accused of misconduct or that his response was inadequate such that it was deliberately indifferent or constituted tacit authorization of offensive practices. Indeed, on the latter point, the record indicates that Defendant Callicut believed that Plaintiff was receiving medical care and would continue to do so upon his late January 2016 transfer out of Randolph Correctional Center to Central Prison. (*See* Ex. H at 7, Grievance No. 4445–2016–EDM–00005, Docket Entry 47-8.) The Court thus recommends granting summary judgment in favor of Moving Defendants.

### III. CONCLUSION

The vast majority of Plaintiff's claims are unexhausted and the exhausted supervisory liability claims cannot survive. Summary judgment should be granted in favor of the Moving Defendants.[9] As all other Defendants have been terminated from this action or have not received service of process, this action should be dismissed.

---

[8] For example, Defendant Callicut reviewed Plaintiff's January 16, 2016 grievance at the second step of the appeals process. (*See* Ex. H at 7, Grievance No. 4445–2016–EDM–00005, Docket Entry 47-8.)

[9] Because the Court recommends summary judgment be granted in favor of Moving Defendants for the reasons discussed above, it need not consider their other arguments. However, the Court does note that Defendants are entitled to sovereign immunity with regards to claims brought against them in their official capacity. *See Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (noting that the Eleventh Amendment bars suits in federal courts for money damages against nonconsenting states and that this immunity extends to state officers acting in their official capacity.)

For the reasons stated herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment (Docket Entry 98) be **GRANTED** and that Judgement be entered dismissing this action.

/s/ Joe L. Webster
Joe L. Webster
United States Magistrate Judge

August 10, 2020
Durham, North Carolina